

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

**ENTERED
09/14/2010**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 09-36638 |
| MSB ENERGY, INC., | § | |
| | § | CHAPTER 11 |
| Debtor. | § | |

| | | |
|---|---|---|
| RICHARD K. PARKER, KAREN E. PARKER, ALVIN E. BETZEL AND SHELIA C. BETZEL | § § § | ADVERSARY NO. 10-03246 |
| | § | |
| Plaintiffs, | § § | |
| VS. | § § | |
| | § | |
| MSB ENERGY, INC. | § § | |
| | § | |
| Defendant. | | |

## AMENDED MEMORANDUM OPINION ON
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT[1]
[Adv. Doc. Nos. 5 & 13]

### I. INTRODUCTION

The dispute at bar involves the propriety and timeliness of shut-in royalty payments pertaining to two Paid Up Oil and Gas leases (collectively the Leases) between Richard K. Parker, Karen E. Parker, Alvin E. Betzel, and Shelia C. Betzel (collectively the Plaintiffs) and MSB Energy, Inc. (MSB).[2]  The Leases were entered into by the Parkers and the Betzels, as lessors, each with an undivided 50% mineral interest, and Reichmann Petroleum Corporation (Reichmann), as lessee.  In

---

[1] This Court's initial Memorandum Opinion was entered on the docket on September 3, 2010. [Adv. Doc. No. 51].  This Amended Memorandum Opinion is the exact same opinion as the initial Memorandum Opinion with one exception; in paragraph 39, on page 12, the last five words have been stricken.

[2] MSB is also the Debtor in the main Chapter 11 case, and the Defendant in the pending adversary proceeding.

June 2008, MSB purchased the Leases from Reichmann and became the operator of the sole well located thereon, the Parker-Betzel Unit No. 1-H (the Well). The Plaintiffs allege that the Leases terminated due to cessation of production because MSB improperly shut-in the Well when there was an "available pipeline" pursuant to the Leases. The Plaintiffs further assert that MSB's disclosure statement serves as a judicial admission that estops MSB from denying that it breached the Leases. Even assuming that there was no cessation of production, the Plaintiffs alternatively contend that the Leases terminated because MSB untimely tendered the shut-in royalty payments. MSB, however, disagrees with the Plaintiffs' assertions—claiming that it did timely and accurately pay shut-in royalties to the Plaintiffs—and, therefore, refuses to relinquish its rights to the Leases. Thus, the Plaintiffs have filed a trespass to try title action and a suit to quiet title to gain possession of both the surface and mineral estates. The Plaintiffs also seek a declaratory judgment that the Leases are terminated, null and void, and of no force and effect or, alternatively, that they are entitled to be paid royalties, interest, and attorneys' fees in accordance with the Leases and commensurate with actual production from the Well.

The Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052. To the extent that any finding of fact is construed as a conclusion of law, it is adopted as such. Moreover, to the extent that any conclusion of law is construed as a finding of fact, it is adopted as such. The Court reserves its right to make additional findings of fact and conclusions of law as it deems appropriate or as may be requested by any of the parties.

## II. PRESENT POSTURE OF THE CHAPTER 11 CASE

MSB filed its voluntary Chapter 11 petition on June 2, 2009, in the Eastern District of Texas, and the Bankruptcy Court in that district transferred venue of the case to the Southern District of Texas on August 20, 2009. MSB obtained confirmation of a plan on March 3, 2010. The dispute

that is the basis of this adversary proceeding arose prior to the filing of MSB's Chapter 11 petition and was discussed at length in the Plaintiffs' objection to the confirmation of MSB's plan.  The Plaintiffs withdrew their objection to confirmation, however, knowing that the dispute would have to be litigated.  Post-confirmation, MSB has been effectuating the terms of the confirmed plan and dealing with litigation that was contemplated under the plan, including the pending adversary proceeding (the Adversary Proceeding).   The outcome of this suit affects MSB's ability to successfully effectuate the plan because if the Leases have terminated (as alleged by the Plaintiffs), then MSB will not be able to sell these assets to help pay claims pursuant to the plan.  Conversely, if the Leases have not terminated (which is MSB's position), then MSB will be able sell these assets to generate proceeds for the payment of claims.

## III. FINDINGS OF FACT

### A.  Facts Giving Rise to the Dispute in the Adversary Proceeding

1.   The Adversary Proceeding centers upon a shut-in royalty dispute pertaining to two Paid Up Oil and Gas leases, as amended. [Adv. Doc. Nos. 5 & 13].

2.   The Paid Up Oil and Gas Lease between Karen E. and Richard K. Parker, as lessors, and Reichmann, as lessee, (the Parker Lease) was originally dated June 29, 2004 and covers an undivided fifty percent (50%) mineral interest in 120.8 acres of land in Johnson County, Texas.  The June 29, 2004 lease was amended by a June 9, 2006 Amendment to Paid Up Oil and Gas Lease. [Adv. Doc. Nos. 5-2, 13-1 & 13-2].

3.   The Paid Up Oil and Gas Lease between Sheila C. and Alvin E. Betzel, as lessors, and Reichmann, as lessee, (the Betzel Lease) was originally dated June 29, 2004 and covers an undivided fifty percent (50%) mineral interest in 121.8 acres of land in Johnson County, Texas.  The June 29, 2004 lease was amended by a June 9, 2006 Amendment to Paid Up Oil and Gas Lease. [Adv. Doc. Nos. 5-7, 13-3 & 13-4].

4. Pursuant to an agreement dated June 9, 2006, the Leases were pooled and unitized with an Oil, Gas and Mineral Lease dated September 29, 2004 between Berry Creek Farms, L.P. and Reichmann, as amended by an October 31, 2005 Amendment and Ratification of Oil, Gas and Mineral Lease (the Pooling Agreement). [Adv. Doc. Nos. 5-2, 5-7, 13-2 & 13-4].

5. In June of 2008, MSB acquired Reichmann's interest and became the lessee of the Leases. [Adv. Doc. Nos. 5 & 13].

6. The Well was the only well drilled on the pooled unit that was capable of producing in paying quantities. [Adv. Doc. Nos. 5 & 13].

7. Between April 2009 and March 2010, MSB paid the Plaintiffs production royalties from the sale of gas via checks sent standard mail with the United States Postal Service (USPS). [Adv. Doc. Nos. 5, 13-6, 13-14 & 13-15].

8. The Leases each have a primary term of "eighteen (18) months . . . and so long thereafter as oil and gas, or either of them, is produced in paying quantities from the leased premises or lands with which the leased premises are pooled pursuant to the provisions of this Lease, or operations are conducted as hereinafter provided." [Adv. Doc Nos. 5-2, 5-7, 13-1 & 13-3].

9. The primary term of each of the Leases may be extended pursuant to paragraph 12, the shut-in royalty clause:

> While there is a well on the leased premises or lands pooled therewith capable of producing gas in paying quantities but the **production thereof is shut-down** or suspended **for lack of** a market, **available pipeline** or because of government restrictions or, if it is economically inadvisable for both the Lessor and Lessee to sell gas for a time as evidenced by a written agreement signed by both parties, then, and in any such event, **Lessee may pay as shut-in royalty on or before ninety (90) days after the date on which (1) production from any such well is shut-in,** shut-down or

4

suspended; or (2) this Lease is no longer maintained by compliance with one of the other preservation provisions hereof, whichever is the later date, **and thereafter at annual intervals the sum of Fifty Dollars ($50.00) per net mineral acre per proration unit per well**, or Five Hundred Dollars ($500.00) per well whichever is greater, for each and every shut-in, shut-down or suspended well. **If such payment is made in accordance with the terms hereof, this Lease shall not terminate**, but shall continue in force for a period of one (1) year from the date of making such shut-in payments . . . and it will be considered that gas is being produced from the leased premises in paying quantities within the meaning of each pertinent provision of this Lease.

(Emphasis added). [Adv. Doc. Nos. 5-2, 5-7, 13-1 & 13-3].

10. The Betzels' shut-in royalty payment is calculated pursuant to the Betzels' 50% mineral interest and paragraph 12 of the Betzel Lease as follows: (121.8 x $50.00/acre) ÷ 2 = $ 3,045.00. [Adv. Doc. Nos. 5-7, 13-3 & 13-4].

11. The Parkers' shut-in royalty payment is calculated pursuant to the Parkers' 50% mineral interest and paragraphs 1 and 12 of the Parker Lease as follows: (120.8 x $50.00/acre) ÷ 2 = $ 3,020.00. [Adv. Doc. Nos. 5-2, 13-1 & 13-2].

12. On May 8, 2009, Freedom Pipeline, L.L.C. (Freedom Pipeline), the sole economical pipeline operator for transporting the Well's gas to market, refused to take gas from the Well, thereby causing a shut-in. [Adv. Doc. Nos. 5, 13-6, 13-8 13-9, 13-10 & 13-11].

13. The shut-in continued for over 90 days. [Adv. Doc. Nos. 5-1, 5-6, 13-6, 13-8, 13-9, 13-10 & 13-11].

14. Both before and after the May 8, 2009 shut-in, the Well was capable of producing   in paying quantities. [Adv. Doc. Nos. 5 & 13-6].

15. On July 29, 2009, MSB wrote a letter to the Parker Plaintiffs (the Parker Shut-in Letter) notifying them of a "pipeline problem" and tendering a check in the amount of $3,070.00 to cover shut-in royalties for the Parker Lease. [Adv. Doc. Nos. 5-3 & 13-12].

16. On July 29, 2009, MSB wrote a letter to the Betzel Plaintiffs (the Betzel Shut-in Letter)

notifying them of a "pipeline problem" and tendering a check in the amount of $3,070.00 to cover shut-in royalties for the Betzel Lease. [Adv. Doc. Nos. 5-8 & 13-13].

17. On July 31, 2009, the USPS accepted both the Parker Shut-in Letter and the Betzel Shut-in Letter (collectively the Shut-in Letters), together with their corresponding shut-in royalty checks, by certified mail. [Adv. Doc. Nos. 13-12 & 13-13].

18. On August 3, 2009, the USPS gave the Plaintiffs notice that the Shut-in Letters were being held at the post office for customer pick-up. [Adv. Doc. Nos. 13-12 & 13-13].

19. On August 4, 2009, Plaintiff Alvin Betzel picked up the Betzel Shut-in Letter, with the corresponding royalty check, from the post office. [Adv. Doc. Nos. 5 & 13-13].

20. On August 6, 2009, shut-in royalty payments were due to the Plaintiffs pursuant to paragraph 12 of the Leases. Paragraph 12 provided that shut-in royalty payments were due on or before 90 days after the shut-in date, which in the suit at bar was 90 days after May 8, 2009, or August 6, 2009.[3] [Adv. Doc. Nos. 5-2, 5-7, 13-1, 13-3 & 13-5].

21. On August 26, 2009, the Parker Plaintiffs picked up the Parker Shut-in Letter, with the corresponding royalty check, from the post office. [Adv. Doc. Nos. 5 & 13-12].

22. On August 28, 2009, the Plaintiffs' attorney, William G. Bredthauer, mailed back to MSB the Parker and the Betzel Plaintiffs' shut-in royalty checks for $3,070 each, along with a Notice of Termination. The Notice of Termination informed MSB that the Leases had terminated for one of two reasons: (1) for failure to satisfy a condition necessary to allow extension of the Leases' primary terms through shut-in royalty payments; and (2)

---

[3] The Plaintiffs contend that the Well was shut in on May 7, 2009, which would make the shut-in royalty payments due on August 5, 2009, as opposed to August 6, 2009. The Plaintiffs, however, offer no proof of their contention. The Court therefore finds that the Well was shut in on May 8, 2009 and, consequently, the shut-in royalty payments were due on August 6, 2009. It is nevertheless insignificant whether the Court finds that the shut-in royalty payments were due on August 5th or August 6th, as the parties' arguments are the same irregardless. Either way, the Betzels clearly had their royalty check in hand by the due date, while the Parkers had not yet picked up their check.

alternatively, in the event the Leases could be extended, for failure to make a timely shut-in royalty payment to the Parker Plaintiffs. [Adv. Doc. Nos. 5-4 & 13].

**B. Events in the Main Chapter 11 Case Leading up to the Filing of the Adversary Proceeding**

23. On September 15, 2009, MSB filed an Amended Motion for Order to Show Cause against Freedom Pipeline as to Why it Should Not Be Sanctioned and/or Held in Contempt for Violating Automatic Stay (the Sanctions Motion). [Main Case Doc. No. 175]. MSB asserted that Freedom Pipeline was engaging in on-going violations of the automatic stay under Section 326(a), including: (a) wrongfully shutting-in a number of MSB's most productive wells; (b) under-nominating MSB's natural gas production from some of its wells; and (c) converting MSB's natural gas production to its own use and benefit. [Main Case Doc. No. 175, p. 5, ¶ 9].

24. On September 22, 2009, Freedom Pipeline filed its Response to the Sanctions Motion. [Main Case Doc. No. 196]. Freedom Pipeline stated that: (a) it had not violated the automatic stay because there is no contract with MSB requiring it to carry MSB's gas on its system; (b) all of its actions occurred pre-petition and were in compliance with the terms of its agreement with MSB; (c) it had not benefited from the transportation of gas through its pipeline and, therefore, has not converted MSB's property; and (d) its actions did not constitute willful violations of a court order and there was no evidence of actual damages to MSB. [Main Case Doc. No. 196, p. 2–7].

25. On October 14, 2009, MSB filed its Disclosure Statement for Plan of Reorganization (the Disclosure Statement), wherein MSB stated that "the Sanctions Motion contends [that Freedom Pipeline's actions] . . . effectively placed the Debtor [MSB] in default of its oil and gas lease obligations and put the [L]eases themselves at risk of termination." [Main

Case Doc. No. 243, p. 11, ¶ 5.6].

26. On November 10, 2009, MSB and Freedom Pipeline entered into an agreed order resolving the Sanctions Motion, which was signed by this Court. A portion of the agreed order reads as follows: "As part of its restoration of service, Freedom [Pipeline] will promptly . . . fix the glycol unit on the Parker-Betzel [the Well] so that MSB can put that well back into production." [Main Case Doc. No. 352, p. 2, ¶ 4].

27. On December 22, 2009, MSB filed its Second Amended Disclosure Statement. [Main Case Doc. No. 501].  The Second Amended Disclosure Statement removed the language that was in the initial Disclosure Statement regarding the Sanctions Motion, no doubt because MSB and Freedom Pipeline had resolved their differences by submitting an agreed order on November 10, 2009.  Instead, the Second Amended Disclosure Statement discussed the terms of the agreed order, mainly that Freedom Pipeline had agreed to: (a) immediately cease and desist from selling MSB gas and promptly assign to MSB's agent the remainder of any imbalance attributable to MSB production; (b) immediately turn over to MSB, upon receipt, all proceeds arising out of or in any way related to its post-petition sales of MSB gas; (c) promptly provide MSB with statements reflecting production back to January of 2008; and (d) immediately recommence transportation and nomination of MSB's gas in accordance with the terms of their gas agreement. [Main Case Doc. No. 501, p. 16–17, ¶ 5.6].

28. On December 28, 2009, this Court signed an order approving the Second Amended Disclosure Statement and setting the plan confirmation hearing for February 22, 2010. [Main Case Doc. No. 523].

29. On January 22, 2010, the Plaintiffs filed a lawsuit against the working interest owners of

the Well, excluding MSB, in the 249th Judicial District Court of Johnson County, Texas

(the State Court Action),[4] seeking to quiet title to the mineral interests in their property

based on an alleged termination of the Leases.

30. On February 10, 2010, MSB filed its Third Amended Plan of Reorganization (the Plan). [Main Case Doc. No. 667]. Under the Plan, MSB is authorized to operate and use certain assets, including its interests in the Leases, to generate proceeds for the payment of allowed claims. [Main Case Doc. No. 667, p. 1 & 17].

31. On February 12, 2010, the Plaintiffs filed their Objection to the Plan. [Main Case Doc. No. 682]. The Plaintiffs objected to the Plan "to the extent that [it] purports to vest or determine any actual ownership interest in the Leases in the Debtor [*i.e.* MSB] upon confirmation." [Main Case Doc. No. 682, p. 4, ¶ 12].

32. Concurrently with the filing of their Objection to the Plan, the Plaintiffs also filed a Motion for Relief from Automatic Stay. [Main Case Doc. No. 681]. In this motion, the Plaintiffs sought a lifting of the stay in order to join MSB as a defendant in the State Court Action so that the issue of whether the Leases have terminated could be resolved as among the Plaintiffs, MSB, and the remaining working interest owners.

33. On February 16, 2010, MSB filed its First Modification to Debtor's Third Amended Plan of Reorganization (First Modification to Plan). [Main Case Doc. No. 216]. This pleading expressly set forth that if additional asset sales are necessary to pay allowed claims under the Plan, then prior to the Effective Date—as that term is defined in the Plan—(the

---

[4] The State Court Action is styled *Richard K. Parker, Karen E. Parker, Alvin E. Betzel and Sheila C. Betzel vs. Kerogen Resources, Inc., Wynn-Crosby Partners I, Ltd., Neumin Production Company and South Barnett Resources, LLC*, Cause No. C201000036.

Effective Date), [5] MSB will sell its unencumbered interests in any other of its oil and gas properties—including the Leases—in order to pay allowed claims on the Effective Date. [Main Case Doc. No. 216, p. 2].

34. On February 22, 2010, this Court held a hearing on the confirmation of the Plan. During this hearing, counsel for MSB announced that several parties who had lodged objections to the Plan—including the Plaintiffs—had withdrawn their respective objections based upon MSB's modifications to the Plan. At this hearing, the Court confirmed the Plan, as modified, and then expressly directed MSB's counsel to draft a confirmation order and have counsel for all parties sign off on this order.

35. On March 2, 2010, MSB filed a Response Opposing the Plaintiffs' Motion to Lift Stay. [Main Case Doc. No. 737]. This response set forth that: (a) the Leases have not terminated; (b) the Leases are property of the bankruptcy estate; (c) no cause existed to lift the stay; and (d) this Court should adjudicate any dispute relating to the Leases.

36. On March 3, 2010, counsel for MSB, in compliance with this Court's instructions at the February 22, 2010 hearing, submitted the order confirming the Plan (the Confirmation Order). [Main Case Doc. No. 742]. Counsel for all parties who had previously lodged objections to the Plan, including the attorney for the Plaintiffs, signed the Confirmation Order "Agreed as to Form and Substance." [Main Case Doc. No. 742, p. 13–14]. Among other things, the Confirmation Order expressly sets forth the following:

   a. The Debtor is authorized to sell—and will sell, if necessary—all of its unencumbered interests in any oil and gas properties, which includes the Leases, prior to the Effective Date in order to generate proceeds to pay allowed claims

---

[5] The Effective Date is defined in Section 1.28 of the Plan as "the date on which the Debtor pays Unsecured Creditors their Allowed Unsecured Claims in full, pursuant to the treatment of Class 7 and Class 8 creditors." [Main Case Doc. No. 667, p. 6].

under the Plan. [Main Case Doc. No. 742, p. 5–7, 10].

b. It is: "ORDERED that this Court shall retain jurisdiction over this case and related matters, proceedings and issues as set forth in the Plan[6] and to the fullest extent allowed by the Bankuptcy Code[.]" [Main Case Doc. No. 742, p. 10].

c. It is: "ORDERED that, should the Motion for Relief from Automatic Stay filed by Richard Parker and Alan Betzel filed herein on February 12, 2010 be granted by Final Order of the Bankruptcy Court, nothing in the Plan or this Order shall prohibit Richard Parker and Alan Betzel from joining the Debtor as a party in [the State Court Action]." [Main Case Doc. No. 742, p. 11].

37. On May 25, 2010, this Court held a hearing on the Motion to Lift Stay and the Response in opposition thereto. At the close of the hearing, the Court made findings of fact and conclusions of law and denied the motion in its entirety. An order to this effect was entered on the docket. [Main Case Doc. No. 907].

## C. The Adversary Proceeding and Events Occurring Subsequent to its Filing

38. On May 28, 2010, the Plaintiffs, having failed to obtain a lifting of the stay so that they could sue MSB in the State Court Action for a declaratory judgment that the Leases have been terminated, filed their Original Complaint against MSB requesting such a declaratory judgment and initiating the Adversary Proceeding now pending before this Court. [Adv. Doc. No. 1]. The Complaint expressly sets forth that "[t]his Court has personal jurisdiction over MSB Energy because it is registered to do business and conducts business in the state of Texas. This Court has jurisdiction over the above-

---

[6] Article XIII of the Plan expressly sets forth that: "The Bankruptcy Court shall retain exclusive jurisdiction over this Chapter 11 Case after Confirmation, notwithstanding Consummation or substantial consummation, for the following purposes: . . . (b) to hear and determine all controversies, suits and disputes that arise in connection with the interpretation, implementation, effectuation, consummation or enforcement of this Plan." [Main Case Doc. No. 667, p. 28–29].

captioned bankruptcy case pursuant to 28 U.S.C. § 1334.  Federal jurisdiction also exists

under 28 U.S.C. § 1334 because this case arises in or is related to the above-captioned

bankruptcy." [Adv. Doc. No. 1, p. 2, ¶ 3].

39. On June 18, 2010, the Plaintiffs filed a Motion for Summary Judgment. [Adv. Doc. No.

5].  The Plaintiffs assert that there was an "available"[7] pipeline for transport both before

and after the Well was improperly shut-in, and MSB failed to timely pay the shut-in

royalty payments—either action independently placing MSB in default of the Leases.

[Adv. Doc. No. 5, p. 11–14].  Additionally, the Plaintiffs contend that certain language in

the Disclosure Statement constitutes a judicial admission that estops MSB from claiming

it did not breach the Leases. [Adv. Doc. No. 5, p. 13].[8]  Thus, the Plaintiffs request that

the Court enter a judgment holding that the Leases terminated and awarding the Plaintiffs

their fees and expenses. [Adv. Doc. No. 5, p. 15].

40. On June 23, 2010, in the main Chapter 11 case, MSB filed its Motion to Extend the

Effective Date of the Plan for 60-90 days. [Main Case Doc. No. 928].   Since the

confirmation of the Plan, MSB has decided that it must sell its wells in order to generate

sufficient funds to make payments due to creditors under the Plan.  Because MSB settled

with Freedom Pipeline, thereby reopening the pipeline that transports gas from several of

the Debtor's wells (including the Well) to market, MSB now has the ability to sell these

---

[7] The Plaintiffs rely on the following dictionary definitions of "available" in concluding that the pipeline was available for transport pursuant to the Leases: "suitable or ready for use; of use or service; at hand; readily obtainable; accessible; having sufficient power or efficiency; [or] valid." [Adv. Doc. No. 5, p. 11–12, ¶ 13]. The word "efficiency" is defined in the Plaintiffs' same dictionary source as "capacity for producing a desired result or effect; effectiveness." [Adv. Doc. No. 13-19].

[8] Although the Plaintiffs failed to articulate in their Motion for Summary Judgment the exact language in the Disclosure Statement that they assert is a judicial admission, the Court assumes it is the following phrase: "the Sanctions Motion contends [that Freedom Pipeline's actions] . . . effectively placed the Debtor [MSB] in default of its oil and gas lease obligations and put the [L]eases themselves at risk of termination." [Main Case Doc. No. 243, p. 11, ¶ 5.6].

wells, but it needs additional time to effectuate the sales. Hence, MSB requested the Effective Date be extended so that it could have an additional 60–90 days to sell the wells.

41. On June 28, 2010, MSB filed its Answer to Plaintiffs' Complaint and Counterclaim in the Adversary Proceeding. [Adv. Doc. No. 7]. The Answer to Complaint and Counterclaim expressly sets forth that "[t]his Court has jurisdiction over the above-styled bankruptcy case and this adversary proceeding pursuant to 28 U.S.C. § 1334." [Adv. Doc. No. 7, p. 5, ¶ 2.4]. MSB maintains that the Leases have not terminated because shut-in royalties were timely paid, and, thus, it remains an active lessee as to the Leases. In the alternative, to the extent that the Plaintiffs establish that the Leases have terminated, MSB asserts a right to an offset for statutory recovery of the drilling costs and improvements it made to the property subject to the Leases. Such improvements include—but are not limited to—well equipment, storage tanks, metering equipment, and pipeline equipment. [Adv. Doc. No. 7, p. 8, ¶ 3.1].

42. On July 7, 2010, the Plaintiffs filed their Answer to Counterclaim. [Adv. Doc. No. 9]. They contend that MSB's counterclaims are simply mirror images of the Plaintiffs' original claims and, as such, are improper.[9] [Adv. Doc. No. 9, p. 5, ¶ 30].

43. On July 12, 2010, this Court entered an order in the main Chapter 11 case granting MSB's unopposed Motion to Extend Effective Date of Plan. [Main Case Doc. No. 962]. The order extended the Effective Date from the original date under the Plan, July 2, 2010,

---

[9] The Plaintiffs' Answer to Counterclaim expressly sets forth the following affirmative defense: "Plaintiff's [sic] claims are simply mirror images of those that already exist and are, thus, improper." [Adv. Doc. No. 9, p. 5, ¶ 30]. Assuming that the Plaintiffs are not intentionally admitting that their own claims are improper, the Court infers that the statement contains a typographical error. Despite the language presented in their answer, the Plaintiffs likely intended to assert that MSB's counterclaims are improper as mirror images of the Plaintiffs' original claims.

to September 22, 2010.  Hence, MSB now has until September 22, 2010 to effectuate the sale of its wells.

44. On July 16, 2010, MSB filed its Response to the Plaintiffs' Motion for Summary Judgment. [Adv. Doc. No. 12].  MSB contends that the pipeline was not available for transport, thereby satisfying a condition for the payment of shut-in royalties to extend the Leases.  MSB further asserts that it timely paid shut-in royalties to all of the Plaintiffs. MSB argues that it is not estopped from claiming that it did not breach the Leases, and that the Plaintiffs' assertion to that effect confuses covenants—which do not terminate a lease—with conditions or limitations—which, when met, can terminate a lease. [Adv. Doc. No. 12, p. 2–6].

45. Also on July 16, 2010, MSB filed its own Motion for Summary Judgment. [Adv. Doc. No. 13].  MSB asserts that the Leases' shut-in clauses should be construed as conditions subsequent or limitations that, if not met, can cause termination.  Because MSB believes the conditions for shut-in payments were met—namely, that there was not an available[10] pipeline to transport the gas from the Well—and such payments were timely paid in full, MSB argues that the Plaintiffs cannot recover as a matter of law because the terms of the Leases were validly extended. [Adv. Doc. No. 13, p. 8–19].

46. On July 19, 2010, in the main Chapter 11 case, MSB filed a Status Report on Property

---

[10] MSB relies on the following definitions of "available" in determining that the pipeline was not available pursuant to the Leases: "ready for immediate use" or "qualified or willing to do something or assume a responsibility." [Adv. Doc. No. 13, p. 14].  Also, in an affidavit attached to MSB's Motion for Summary Judgment, Alan D. Cummings, an attorney who has practiced almost exclusively in oil and gas law since 1978 and has been board certified in Oil, Gas and Mineral Law by the Texas Board of Legal Specialization since 1987, testified that "shut-in clauses conditioned on the lack of an available pipeline address multiple instances in which a pipeline might not be available.  For example, the closest and most economical pipeline might not yet be connected to the well; a fully connected pipeline might become inoperable due to damage caused by floods, hurricanes or other natural disasters; a fully connected pipeline might have a lack of pipeline capacity; and, as in this case, the pipeline might refuse to take the gas offered by the producer." [Adv. Doc. No. 13-5, p. 4, ¶ 10].

Sales. [Main Case Doc. No. 969]. This report reflects that the Debtor has sold some of the oil and gas properties in which it has an interest pursuant to the terms of the Plan. These proceeds, however, are allocated solely for the payment of secured claims.

47. On July 30, 2010, the Plaintiffs filed their Response to Defendant's Motion for Summary Judgment, Reply to Defendant's Response to Plaintiffs' Motion for Summary Judgment and Brief in Support (the Plaintiffs' Response and Reply). [Adv. Doc. No. 14]. The Plaintiffs request that the Court deny MSB's Motion for Summary Judgment, grant the Plaintiffs' Motion for Summary Judgment, enter a judgment holding that the Leases terminated, and award Plaintiffs their fees and expenses. The Plaintiffs contend that a pipeline was available to transport gas from the Well, but that MSB refused to pay, or was incapable of paying, the pipeline fee. Thus, according to the Plaintiffs, shut-in royalty payments were not available to perpetuate the Leases. And, even if they were, the Plaintiffs assert that the shut-in royalty payments were untimely as to the Parkers, resulting in an absolute termination of the Leases according to their terms. [Adv. Doc. No. 14, p. 6–11].

48. On August 5, 2010, MSB filed its Reply to Plaintiffs' Response to Defendant's Motion for Summary Judgment and Reply to Defendant's Response to Plaintiffs' Motion for Summary Judgment and its Motion to Strike Plaintiffs' Summary Judgment Evidence Attached Thereto (MSB's Reply and Motion to Strike). [Adv. Doc. No. 24]. Specifically, MSB sought to strike two pieces of summary judgment evidence—Exhibits B and C to the Plaintiffs' Response and Reply (the Parkers' affidavits). MSB asserts that both of these exhibits improperly bootstrap hearsay from the USPS into the summary judgment record, and that Exhibit B is not based on the personal knowledge required of an affidavit

and summary judgment evidence. [Adv. Doc. No. 24, p. 2, ¶ 1.1]. Further, MSB argues that the Plaintiffs' efforts to cast unspecific statements in pleadings as an admission that the Leases terminated illustrates the Plaintiffs' own misunderstanding of well-established oil and gas law, as well as the importance of MSB's briefing regarding covenants and conditions. [Adv. Doc. No. 24, p. 2, ¶ 1.2].

49. On August 6, 2010, the Plaintiffs filed their Objections to the Affidavits of Allen B. Cummings and David D. Knepper. [Adv. Doc. No. 28]. The Plaintiffs assert that the Cummings and Knepper Affidavits contain improper hearsay, legal conclusions, and statements without a proper foundation.

50. Also on August 6, 2010, the Plaintiffs filed their Motion for Leave to Supplement Summary Judgment Evidence with Attached Affidavit and Motion for Expedited Consideration of Same. [Adv. Doc. No. 30]. The Plaintiffs contend that granting leave will result in a more complete summary judgment record by allowing them to secure additional evidence from Freedom Pipeline regarding the availability of a pipeline to transport gas from the Well at the time it was shut-in. [Adv. Doc. No. 30, p. 1–2]. The Plaintiffs argue that such relief is warranted given the limited time since they were put on notice of MSB's position regarding the pipeline and their diligent efforts thereafter to obtain evidence from Freedom Pipeline to address MSB's allegations. [Adv. Doc. No. 30, p. 2–4].

51. On August 9, 2010, MSB filed its Response in Opposition to Plaintiffs' Motion for Leave to Supplement Summary Judgment Evidence, and Alternatively, MSB Energy Inc.'s Motion for Leave to Supplement the Summary Judgment Evidence with a Stipulation or Attached Affidavit and Motion for Expedited Consideration of Same. [Adv. Doc.

35]. MSB contends that the Plaintiffs' Motion for Leave to Supplement: (a) is a red herring that attempts to downplay the Plaintiffs' lack of diligence in seeking discovery on an issue they knew or reasonably should have known would be at issue in the summary judgment proceeding; (b) improperly submits evidence on an issue—Freedom Pipeline's reasons for refusing to transport gas from the Well—that was not raised by MSB's Motion for Summary Judgment; and (c) seeks to improperly offer an inadmissible affidavit from Freedom Pipeline. In the alternative, should the Plaintiffs be granted leave to supplement, MSB moves for leave to supplement its own summary judgment evidence either with an affidavit of Don Beckham or a proposed stipulation, both providing the evidence the Plaintiffs seek to introduce—namely, Freedom Pipeline's alleged reason for refusing to transport gas from the Well. [Adv. Doc. No. 35, p. 2–3].

52. Also on August 9, 2010, MSB filed its Response to Plaintiffs' Objections to the Affidavits of Allen B. Cummings and David D. Knepper, specifically countering each of the Plaintiffs' objections and requesting that this Court overrule these objections in their entirety. [Adv. Doc. No. 36].

53. On August 9, 2010, Plaintiffs filed their Response to MSB Energy, Inc.'s Motion to Strike Plaintiffs' Summary Judgment Evidence. [Adv. Doc. No. 37]. The Plaintiffs maintain that the Parkers' affidavits do not contain inadmissible hearsay. They assert that the contested testimony is not offered to prove to truth of the statements the Parkers were allegedly told at the post office. Rather, they argue that the testimony is offered only to show what the Parkers did or did not know regarding the delivery of the shut-in royalty payments to the post office.

54. On August 10, 2010, this Court held a hearing on the competing Motions for Summary

Judgment [Adv. Doc. Nos. 5 & 13], the competing requests to strike affidavits in support

of the summary judgment motions [Adv. Doc. Nos. 24 & 28], and the Plaintiffs' Motion

for Leave to Supplement Summary Judgment Evidence [Adv. Doc. No. 30].  During the

course of the hearing, the Court granted MSB's request to strike portions of the Parker

affidavits, denied the Plaintiffs' request to strike portions of the Cummings and Knepper

affidavits, and denied the Plaintiffs' Motion for Leave to Supplement Summary Judgment

Evidence.  Having made these rulings, the Court thereafter heard oral arguments from

both counsel on the competing motions for summary judgment and then took the matters

under advisement.

## IV. CONCLUSIONS OF LAW

### A.  Jurisdiction and Venue

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b)

and 157(a).  Venue is proper pursuant to 28 U.S.C. § 1409(a).

### 1.  Subject Matter Jurisdiction

In both the Complaint filed by the Plaintiffs and the Answer and Counterclaim filed by MSB,

the parties set forth that this Court has jurisdiction over the Adversary Proceeding pursuant to 28

U.S.C. § 1334. [Findings of Fact Nos. 38 & 41].  The Court agrees, but because the Plaintiffs filed

the Complaint after confirmation of the Plan, and because the Fifth Circuit has held that a

bankruptcy court's post-confirmation jurisdiction is narrower than its pre-confirmation jurisdiction,

see In re Craig's Stores of Texas, Inc. 266 F.3d 388, 390–91 (5th Cir. 2001), it is appropriate for this

Court to set forth in detail why it believes it has subject matter jurisdiction over this particular

lawsuit.

The Fifth Circuit has consistently held that "[a]fter a debtor's reorganization plan has been

confirmed, the debtor's estate, and thus bankruptcy jurisdiction, ceases to exist, other than for

matters pertaining to the implementation or execution of the plan." *Id.* at 390; *In re U.S. Brass Corp.*, 301 F.3d 296, 304 (5th Cir. 2002); *Newby v. Enron Corp. (In Re Enron Corp. Securities)*, 535 F.3d 325, 335 (5th Cir. 2008). In *Enron*, the Fifth Circuit relied on three factors, first articulated in *Craig's Stores*, in determining whether the bankruptcy court had jurisdiction over a lawsuit filed post-confirmation: (1) whether the claim at issue principally deals with pre-confirmation relations between the parties; (2) whether there was antagonism between the parties as of the date of the reorganization—*i.e.* as of the date of the plan confirmation hearing (the Confirmation Date); and (3) whether there are any facts or law deriving from the reorganization or the plan that are necessary to the claim. 535 F.3d at 335. In evaluating these factors, the Fifth Circuit has emphasized that the bankruptcy court may retain jurisdiction over post-confirmation claims even if all three factors do not weight heavily in the bankruptcy court's favor. *Id.* at 335–36 ("Neither party presents arguments concerning the third *Craig's Stores* factor . . . Even if they did, such arguments would be of no consequence because the first two *Craig's Stores* factors weigh heavily in favor of federal jurisdiction.").

With respect to the first factor, all claims at issue in the Adversary Proceeding—including both the Plaintiffs' claims and MSB's counterclaims—deal entirely with pre-confirmation relations between the parties. The Parker and Betzel Leases were originally executed in June of 2004, and MSB acquired Reichmann's interest and became the lessee of the Leases in June of 2008. [Findings of Fact Nos. 2, 3 & 5]. MSB filed its voluntary Chapter 11 petition a year later, in June of 2009, and the Court did not hold its confirmation hearing until February 22, 2010. [Finding of Fact No. 34]. Thus, the Leases that are the subject of the Adversary Proceeding were not only executed well before the Confirmation Date, but were, in fact, executed long before the filing of MSB's bankruptcy petition. In fact, MSB had been making monthly royalty payments to the Plaintiffs pursuant to the

Leases prior to the filing of its petition. [Finding of Fact No. 7].   Moreover, MSB's counterclaims are for damages related to pre-complaint improvements. [Finding of Fact No. 41].   Under these circumstances, the first factor weighs heavily in favor of bankruptcy court jurisdiction.

In evaluating the second factor, the Court finds that there was significant antagonism pending between the Plaintiffs and MSB as of the Confirmation Date—*i.e.* as of February 22, 2010, the date that this Court held the confirmation hearing. [Finding of Fact No. 34].   Indeed, the Plaintiffs maintain that the Leases were properly terminated in August of 2009, more than six months prior to the Confirmation Date, because there was an available pipeline for transport before and after the Well was improperly shut-in or, alternatively, MSB failed to timely tender its shut-in royalty payments to the Plaintiffs. [Findings of Fact Nos. 38 & 39].   On January 22, 2010, the Plaintiffs filed the State Court Action against the working interest owners of the Well—excluding MSB only to avoid a violation of the automatic stay—seeking to quiet title to the mineral interests in their property based on an alleged termination of the Leases. [Finding of Fact No. 29].   On February 12, 2010, the Plaintiffs filed a seven-page objection to the Plan which reviewed in detail the dispute between the parties—namely, whether or not the Leases have terminated—to ensure that this Court did not confirm a plan that "purports to vest or determine any actual ownership interest in the Leases in the Debtor [MSB]." [Finding of Fact 31].   The Plaintiffs also concurrently filed their Motion for Relief from Automatic Stay, seeking to lift the stay in order to join MSB as a defendant in the State Court Action. [Finding of Fact No. 32].   Under all of these circumstances, there is no question that long before the Confirmation Date, there was significant antagonism between the Plaintiffs and MSB.   Thus, this second factor weighs heavily in favor of this Court having jurisdiction over this dispute.

At this point, pursuant to the analysis presented in *Enron*, the Court retains its jurisdiction even if the third factor fails. 535 F.3d at 336. Indeed, the Fifth Circuit indicated that the limitation on the bankruptcy court's post-confirmation jurisdiction it previously set forth in *Craig's Stores* does not apply to pre-confirmation claims. *Id.* at 335 ("The *Craig's Stores* Court did hold that a bankruptcy court may *lack* jurisdiction over post-confirmation claims based on post-confirmation activities, but the *Craig's Stores* Court did not hold that a bankruptcy court may *lose* jurisdiction over pre-confirmation claims based on pre-confirmation activities.") (emphasis in original). In arriving at this conclusion, the Fifth Circuit highlighted the factual distinction between the two cases: the post-confirmation claims based on post-confirmation activities discussed in *Craig's Stores* contrasted with the pre-confirmation claims based on pre-confirmation activities addressed in *Enron*. *Id.* ("Notwithstanding its statement that bankruptcy jurisdiction exists after plan confirmation only 'for matters pertaining to the implementation or execution of the plan,' the facts in *Craig's Stores* were narrow; they involved post-confirmation claims based on post-confirmation activities.") (citing *Craig's Stores*, 266 F.3d at 390). In the suit at bar, this Court is addressing pre-confirmation claims based on pre-confirmation activities and, thus—according to the Fifth Circuit's analysis set forth in *Enron*—retains bankruptcy jurisdiction over the Adversary Proceeding without consideration of the third factor presented in *Craig's Stores*.[11]

---

[11] The Court does note a distinction between the claims at issue in the Adversary Proceeding and the claims at issue in *Enron*. Specifically, all of the pending cases that were the subject of the adversary proceeding in *Enron* were filed prior to confirmation. *Id.* at 334. In the suit at bar, the Adversary Proceeding itself was not filed until May 28, 2010 [Finding of Fact No. 38], three months following the confirmation hearing held on February 22, 2010 [Finding of Fact No. 34]. It does not necessarily follow, however, that the underlying claims at issue in the Adversary Proceeding are not "pre-confirmation claims," as that term is referenced in *Enron*. To the contrary, this Court maintains that the filing of the Adversary Proceeding is not determinative of when the claims at issue arose in this case, as the Plaintiffs initiated the State Court Action and filed a motion to lift stay in MSB's Chapter 11 case seeking to join it as a defendant in the State Court Action, all prior to the confirmation of the Plan [Findings of Fact Nos. 29 & 32]. In fact, the Plaintiffs' counsel signed the Confirmation Order "Agreed as to Form and Substance" because MSB agreed to insert language into the order expressly stating that if this Court granted its motion to lift stay, nothing in the Plan or the Confirmation Order would prevent the Plaintiffs from joining MSB in the State Court Action. [Finding of Fact No. 36]. Thus, the Plaintiffs did not have need to file the Adversary Proceeding until this Court denied their motion to lift stay [Finding of Fact No. 37], thereby preventing them from joining MSB as a defendant in the pre-confirmation State Court Action, as they originally

Assuming, however, that all three factors must be satisfied, the Court finds that the third factor is easily met in the suit at bar. With respect to this factor, there are abundant facts and law deriving from the reorganization and the Plan that are necessary to the resolution of this Adversary Proceeding. Indeed, numerous events in MSB's main Chapter 11 case led up to the filing of the pending suit. Specifically, MSB filed the Sanctions Motion against Freedom Pipeline asserting that it violated the automatic stay by wrongfully shutting in the Well. [Finding of Fact No. 23]. Subsequently, MSB and Freedom Pipeline entered into an agreed order which stated that Freedom Pipeline would fix the Well so that MSB could place it back in production. [Finding of Fact No. 26]. This agreement then allowed MSB, in the Plan, to provide that it would, after confirmation, operate and use its interests in the Leases to generate proceeds for the payment of allowed claims. [Finding of Fact No. 30]. Meanwhile, the Plaintiffs initiated the State Court Action against all working interest owners except MSB, asserting that the Leases terminated due to an improper shut-in or, alternatively, failure to timely pay shut-in royalty. [Finding of Fact No. 29]. The Plaintiffs also lodged an objection to the Plan to the extent that it "purports to vest or determine any actual ownership interest in the Leases in [MSB]" and filed a motion seeking relief from the automatic stay in order to join MSB in the State Court Action. [Findings of Fact Nos. 31 & 32].

And then, just prior to the confirmation hearing on February 22, 2010, the Plaintiffs negotiated with MSB and agreed that they would withdraw their objection to the Plan in exchange for certain language being inserted in the Confirmation Order. [Findings of Fact Nos. 34 & 36]. In fact, counsel for the Plaintiffs signed off on the Confirmation Order "Agreed as to Form and Substance." [Finding of Fact No. 36]. This order contains, among other language, certain

---

intended. Accordingly, the Court finds that the underlying dispute—namely, whether the Leases have terminated—is, in fact, a pre-confirmation claim.

paragraphs related to the dispute between the Plaintiffs and MSB and where this dispute will be adjudicated. One paragraph states as follows:

> "ORDERED that, should the Motion for Relief from Automatic Stay filed by Richard Parker and Alan Betzel filed herein on February 12, 2010 be granted by Final Order of the Bankruptcy Court, nothing in the Plan or this Order shall prohibit Richard Parker and Alan Betzel from joining the Debtor as a party in [the State Court Action]."

[Finding of Fact No. 36(c)]. Another paragraph sets forth that "this Court shall retain jurisdiction over this case and related matters, proceedings and issues set forth in the Plan and to the fullest extent allowed by the Bankruptcy Code." [Finding of Fact No. 36(b)]. Moreover, the Plan to which the order refers expressly states that this Court shall retain jurisdiction "to hear and determine all controversies, suits and disputes that arise in connection with the interpretation, implementation, effectuation, consummation or enforcement of this Plan." [Finding of Fact No. 36(b)]. Given that MSB believes the Leases have not terminated and the Plan authorizes MSB to sell or otherwise use its interest in these Leases to generate proceeds for payment of allowed claims, there can be no doubt that the Plaintiffs—by their attorney signing off on the Confirmation Order as "Agreed as to Form and Substance" [Finding of Fact No. 36]—agreed and understood that this Court, if it did not lift the stay to allow the dispute to be tried in Texas state court, would adjudicate the dispute itself.

And, that is exactly what has happened. On May 25, 2010, a hearing was held on the Plaintiffs' Motion for Relief from Automatic Stay, which MSB opposed, and this Court issued an order denying the motion. [Finding of Fact No. 37]. Three days later, on May 28, 2010, the Plaintiffs filed their Original Complaint in this Court initiating the pending adversary proceeding. [Finding of Fact No. 38]. The Complaint represents a formal lawsuit reflecting the pre-confirmation conflict between the parties, the resolution of which assuredly hinges on an evaluation of facts and law derived from the underlying Chapter 11 case, as well as the language presented in the Plan and

Confirmation Order. Under all of these circumstances, this third factor also weighs heavily in favor of this Court having jurisdiction over the Adversary Proceeding.

In sum, according to a complete analysis of the factors set forth in *Craig's Stores*, the Court finds that this dispute pertains to the implementation and execution of the Plan and, likewise, this Court retains jurisdiction over the Adversary Proceeding.[12]  Indeed, MSB's interest in the Leases is one asset under the Plan that MSB may seek to sell in order to generate proceeds to pay allowed claims under the Plan. [Finding of Fact Nos. 33 & 36(a)].  The Plaintiffs request in their Complaint and Motion for Summary Judgment that this Court issue a declaratory judgment that the Leases are canceled. [Finding of Fact No. 38].  Accordingly, the outcome of this suit does affect MSB's ability to successfully effectuate the Plan because if the Leases have terminated (as alleged by the Plaintiffs), then MSB will not be able to sell these assets to help pay claims pursuant to the Plan. Conversely, if the Leases have not terminated (which is MSB's position), then MSB will be able to

---

[12] In *In re Encompass Services Corp.*, 337 B.R. 864 (Bankr. S.D. Tex. 2006), this Court distilled the holdings of *Craig's Stores* and *US Brass* to describe six specific factors for a bankruptcy court to consider in determining whether it has post-confirmation jurisdiction over an adversary proceeding.  Since *Encompass*, however, the Fifth Circuit has issued its decision in *Enron* and articulated the three factors already set forth herein.  That is why in this Opinion, this Court is not reviewing the six factors set forth in *Encompass* and in other pre-*Enron* opinions of this Court.  Even if this Court applied the six factors, this Court would still conclude that it has jurisdiction over the Adversary Proceeding.  Granted, in *Encompass*, this Court held that it did not have jurisdiction over a suit that was filed after confirmation of the debtor's plan.  However, the facts in that suit are easily distinguishable from those in the Adversary Proceeding at bar.  In *Encompass*, neither of the parties was the debtor; the claim arose post-confirmation; the effective date of the plan had occurred more than two years prior to the filing of the suit; the outcome of the suit had no effect on the interpretation or the implementation of the plan; and the plaintiff was clearly forum shopping because it had already filed suit in California but had received unfavorable rulings.  In the suit at bar, MSB, the Debtor, is a party [Finding of Fact No. 38]; the dispute arose pre-confirmation [Findings of Fact Nos. 29, 31 & 32]; the effective date of the Plan has not yet occurred—as the effective date is September 22, 2010 [Finding of Fact No. 33]; the suit directly affects MSB's implementation of the Plan by determining whether it can sell its interest in the Leases to generate proceeds to pay claims under the Plan [Finding of Fact No. 36]; and there is absolutely no forum shopping: indeed, the Plaintiffs, not MSB, initiated the suit [Finding of Fact No. 38].  And, the Plaintiffs knew full well that they might file suit in this Court when their counsel signed off as "Agreed as to Form and Substance" on the Confirmation Order. [Finding of Fact No. 36].

avail itself of the opportunity to sell these interests to generate proceeds for payment of claims under the Plan.[13]

2. Core Proceeding

Having concluded that subject matter jurisdiction exists over the parties' dispute, this Court must now determine whether it may hear and determine this dispute as a core proceeding. A proceeding is core if it arises under Title 11 or arises in a case under Title 11. 28 U.S.C. § 1334(b). In *U.S. Brass*, the Fifth Circuit noted that 11 U.S.C. § 1142(b) authorizes post-confirmation orders from a bankruptcy court that are "necessary for the consummation of the plan." *U.S. Brass*, 301 F.3d at 305.   The Fifth Circuit also noted that a proceeding that falls within Section 1142(b) is a proceeding that "arises in" a case under Title 11. *Id.* at 306.  In *U.S. Brass*, each party argued that a ruling in its favor was necessary to the implementation or execution of the confirmed plan in that Chapter 11 case; and, in the Fifth Circuit's view, these circumstances could arise only in a bankruptcy. *Id.*  In the dispute at bar, whether or not the Leases have terminated directly affects the implementation of MSB's confirmed plan. As already noted, if the Leases have terminated (as alleged by the Plaintiffs), then MSB will not be able to sell these assets to help pay claims pursuant to the Plan.  Conversely, if the Leases have not terminated (which is MSB's position), then MSB will be able to avail itself of the opportunity to sell or otherwise use these interests to generate proceeds for payment of claims. [Findings of Fact Nos. 30 & 36(a)].  For these reasons, this Court concludes that the dispute at bar constitutes a core proceeding.

---

[13] Following confirmation of the Plan, property of MSB's Chapter 11 estate revested, and MSB, in its capacity as a reorganized debtor, has begun selling assets and paying claims. [Finding of Fact No. 46].  However, the Effective Date under the Plan (*i.e.* September 22, 2010) has not yet arrived. [Finding of Fact No. 43].  Under the Plan, the Effective Date is defined as the date on which MSB pays unsecured claims in full. [Finding of Fact No. 33].  Given all of these circumstances, the Plan may well be substantially consummated but, just as was noted about the plan in *U.S. Brass*, 301 F.3d at 305, the Plan here has not been *fully* consummated.  MSB has not yet paid any unsecured claims and still has to generate proceeds to pay these claims for complete consummation to occur. [Finding of Fact No. 46].  Therefore, the outcome of the Adversary Proceeding pertains to the implementation or execution of the Plan—*i.e.* "impacts compliance with or completion of the Plan." *See id.*

Alternatively, this Court concludes that this suit is a core proceeding because it falls within 28 U.S.C. § 157(b)(2)(O).[14]  It does so because on the Confirmation Date, MSB took the position that the Leases were property of the bankruptcy estate that would be used to help pay claims under the Plan, whereas the Plaintiffs took the position that the Leases, having terminated, were not property of the bankruptcy estate that could be used to help pay claims under the Plan. [Findings of Fact Nos. 34, 36, 38 & 41].  With the Plan having been confirmed, the possibility exists—assuming that this Court holds that the Leases are in effect—that MSB will be able to sell its interest in the Leases to generate proceeds to pay claims. [Finding of Fact No. 36(a)].  Accordingly, the dispute at bar is a proceeding "affecting the liquidation of the assets of the estate" under 28 U.S.C. § 157(b)(2)(O).

Additionally, this adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(O) because it "affects the adjustment of the debtor-creditor relationship."  On August 28, 2009, the Plaintiffs returned the shut-in royalty payments to MSB. [Finding of Fact No. 22]. If this Court holds that the Leases have not been terminated and are in effect, then MSB will owe the Plaintiffs these payments—*i.e.* the Plaintiffs will be creditors of MSB.  Conversely, if this Court holds that the Leases have been terminated, then MSB will not owe the Plaintiffs these payments—*i.e.* the Plaintiffs will not be creditors of MSB.  Thus, this suit necessarily affects the adjustment of the debtor-creditor relationship and is therefore a core proceeding.

The suit also affects the debtor-creditor relationship in a separate and distinct respect. MSB has filed counterclaims against the Plaintiffs seeking sums for pre-confirmation improvements to the property governed by the Leases. [Finding of Fact No. 41].  MSB only seeks such damages if this

---

[14] In *U.S. Brass*, the Fifth Circuit noted that "[a]lthough we have declined to read § 157(b)(2)(O) broadly . . . we have also not hesitated to apply it in proceedings falling within the plain meaning of the statutory text." *Id.* at 306, n. 33. Indeed, in *U.S. Brass*, the Fifth Circuit made an alterative conclusion that the dispute there was a core proceeding under 28 U.S.C. § 157(b)(2)(O).  In the dispute at bar, this Court also makes such an alternative conclusion for the reasons stated herein.

Court actually holds that the Leases are terminated. [Finding of Fact No. 41]. Nevertheless, were this Court to hold that the Leases were terminated but, additionally, also to hold that MSB is entitled to recover damages from the Plaintiffs for pre-confirmation improvements made by MSB, then the Plaintiffs would not be a creditor of MSB, but MSB would be a creditor of the Plaintiffs; and, as such, this adversary proceeding would affect the adjustment of the debtor-creditor relationship. Thus, once again, this suit is a core proceeding under 28 U.S.C. § 157(b)(2)(O).

Finally, and in the alternative, this suit affects the adjustment of the debtor-creditor relationship because if the Court holds that the Leases have been terminated, the Debtor will have fewer assets to use or otherwise sell in order to generate proceeds to pay claims of the creditor body under the Plan. In this respect—*i.e.* viewing the dispute as affecting *all* creditors and parties in interest in this case, as opposed to just the Plaintiffs—this dispute affects the adjustment of the debtor-creditor relationship. Thus, the suit is a core proceeding.

**B.     The Leases are not terminated.**

1. Because there was no "available pipeline" for MSB to transport gas from the Well, MSB could tender shut-in royalty payments to prevent the Leases from terminating.

In interpreting the provisions of an unambiguous lease, a court must determine the parties' intent by looking within the four corners of the document, examining and harmonizing every part of the document, and giving effect to each of its clauses. *Heritage Res., Inc. v. Nations Bank*, 939 S.W.2d 118, 121 (Tex. 1996). A lease is a contract that must be construed "from a utilitarian standpoint bearing in mind the particular business activities sought to be served and . . . avoid[ing] when possible and proper a construction that is unreasonable, inequitable and oppressive." *Frost Nat'l Bank v. L&F Distrib., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (*per curium*) (internal quotations and citations omitted).

Where the terms of a lease are undefined, the court must determine the definition of the terms based upon their plain grammatical meaning, unless doing so would defeat the parties' intention. *DeWitt County Elec. Coop, Inc. v. Parks*, 1 S.W.3d 96, 101 (Tex. 1998); *In re Brookshire Bros., Ltd.*, 198 S.W.3d 381, 386 (Tex. App.—Texarkana 2006, no pet.). A court should look at dictionary definitions and the common usage of the words in making its determination. *In re Brookshire*, 198 S.W.3d at 386. Further, a court "cannot, in the guise of 'interpreting' the contract, substitute [its] own, unsupported definition of an undefined term for that term's well-established and commonly-understood definition." *Oil, Chem & Atomic Workers, Int'l Union v. Amoco Oil Co.*, 811 F. Supp. 260, 262 (S.D. Tex. 1993) (applying rules of contract construction in an arbitration setting).

In the suit at bar, paragraph 12 of the Leases provides that shut-in royalty payments may be made when production is shut-in for certain specified conditions, including the lack of an "available pipeline." [Finding of Fact No. 9]. Although the terms "available" or "available pipeline" are not defined in the Leases, numerous definitions of "available" are offered in the Plaintiffs' and MSB's Motions for Summary Judgment. Applying any one of these definitions, this Court concludes that the condition precedent to shutting-in the Well was satisfied.

On May 8, 2009, the pipeline's operator, Freedom Pipeline, refused to accept gas from the Well, thereby causing the Well to be shut-in for more than 90 days. [Findings of Fact Nos. 12 & 13]. The Plaintiffs contend that the pipeline was "available" pursuant to the Leases, relying on the following dictionary definitions: "suitable or ready for use; of use or service; at hand; readily obtainable; accessible; having sufficient power or efficiency; [or] valid."[15] [Finding of Fact No. 39].

---

[15] http://dictionary.reference.com/browse/available.

The word "efficiency" is defined in the Plaintiffs' same dictionary source as "capacity for producing a desired result or effect; effectiveness."[16] [Finding of Fact No. 39].

This Court concludes that the pipeline was not "available" under any of the Plaintiffs' definitions. When a pipeline operator refuses to transport, necessarily the pipeline itself is not "suitable or ready for use; of use or service; at hand; readily obtainable; accessible . . . [or] valid" for the party that seeks to transport the gas. Additionally, under these circumstances, the pipeline does not have "sufficient power or efficacy" because a pipeline which is not allowed to be used to transport gas cannot "produc[e] a desired result or effect"—*i.e.* transport the gas to market and pay the Plaintiffs' royalties.[17]

MSB contends that the pipeline was not "available" pursuant to the Leases and offers the following dictionary definitions of "available": "ready for immediate use" or "qualified or willing to do something or assume a responsibility."[18] [Finding of Fact No. 45]. This Court agrees with MSB that the pipeline was not "available" according to these definitions because the pipeline was not "ready for immediate use" in that the Well was forced to be shut-in for over 90 days. [Finding of Fact No. 13]. The pipeline was also not "qualified or willing to do something or assume a responsibility" because Freedom Pipeline was not willing to take and transport the Well's gas. [Finding of Fact No. 12]. Indeed, Allen D. Cummings, an attorney who has practiced almost exclusively in oil and gas law since 1978 and has been board certified in Oil, Gas and Mineral Law by the Texas Board of Legal Specialization since 1987, testified by affidavit that "shut-in clauses

---

[16] http://dictionary.reference.com/browse/efficiency.

[17] The Court also rejects the Plaintiffs' contention that the pipeline was "available" pursuant to the anti-discrimination regulations of The Common Purchaser Act of 1930 and the Railroad Commission Rule 7.7001. Anti-discrimination requirements do not make the pipeline "available" under the facts of this suit, where the pipeline operator refused to transport the Well's gas.

[18] Merriam Webster's Collegiate Dictionary 79 (10th ed. 1993).

conditioned on the lack of an available pipeline address multiple instances in which a pipeline might

not be available. For example, . . . as in this case, the pipeline might refuse to take the gas offered by

the producer." [Finding of Fact No. 45]. Moreover, concluding that there was a lack of an available

pipeline is not an unreasonable, inequitable or oppressive interpretation in the suit at bar, especially

given the fact that the Well was shut-in due to actions of a third party—*i.e.*, Freedom Pipeline.[19]

[Finding of Fact No. 12].

Therefore, this Court concludes that when Freedom Pipeline refused to accept gas from the

Well, thereby causing the Well to be shut-in, there was not an "available pipeline" for MSB to

transport gas to market. Thus, according to paragraph 12 of the Leases, MSB could tender shut-in

royalty payments to prevent the Leases from terminating due to the shut-in of the Well.

2. <u>MSB tendered shut-in royalty payments to the Plaintiffs in accordance with the Leases'
   requirements.</u>

Texas courts tend to construe shut-in royalty clauses strictly against the lessee, especially if

the lease provides for the timely payment of a shut-in royalty in order to prevent lease termination.

*See* ERNEST E. SMITH & JACQUELINE WEAVER, TEXAS LAW OF OIL & GAS, § 4.5[C][3] (2nd ed.

2009). In *Freeman v. Magnolium Petroleum Co.*, one of the leading cases on late shut-in royalty

payments, the Texas Supreme Court held that an oil and gas lease terminated when the lessee

attempted to tender a shut-in royalty payment more than four months late. 171 S.W.2d 339, 342

(Tex. 1943).

The method of payment for monetary obligations in an oil and gas lease may or may not be

specified in the lease. *See generally* SMITH & WEAVER, § 4.5[C]. In a delay rental payment dispute,

---

[19] As a result of Freedom Pipeline's refusal to take gas from the Well and from several of MSB's other wells, MSB filed its Sanctions Motion on October 14, 2009. [Finding of Fact No. 23]. On November 11, 2009, MSB and Freedom Pipeline announced to this Court that they had reached a tentative settlement on the Sanctions Motion, agreeing in relevant part to fix the glycol unit on the Well so that MSB could put the Well back into production. [Finding of Fact No. 26].

where the method of payment was not specified, the Texarkana Court of Appeals adopted the Restatement (Second) of Contracts § 249 (1981)[20] "as the rule applicable to contractual obligations for the payment of money." *TSB Exco Inc. v. Smith*, 818 S.W.2d 417, 420–21 (Tex. App.— Texarkana 1991), *overruled in part on other grounds in reh'g*, 1991 Tex. App. LEXIS 2210 (Tex. App.—Texarkana Sept. 4, 1991). Restatement § 249 provides that "where the payment or offer of money is made a condition of obligor's duty, payment or offer of payment *in any manner current in the ordinary course of business* satisfies the requirement unless the obligee demands payment in legal tender and gives any extension of time reasonably necessary to procure it." (emphasis added). In *TSB Exco Inc.*, the court held that a check constituted payment of the delay rental because "checks are used for payment of such obligations in the ordinary course of business." 818 S.W.2d. at 421.

Additionally, a shut-in royalty must not only be paid on time and in the proper manner, but it must also be paid to the right persons and in the correct amount. SMITH & WEAVER, § 4.5[C][3]. Indeed, multiple Texas state appellate courts have found that erroneous and late payments do not satisfy the requirements of a shut-in royalty payment. *See, e.g., Atkinson Gas Co. v. Albrecht*, 878 S.W.2d 236 (Tex App.—Corpus Christi 1994, writ denied); *Amber Oil & Gas Co. v. Bratton*, 711 S.W.2d 741 (Tex. App.—Austin 1986, no writ).

In the suit at bar, MSB tendered the shut-in royalties on time, in the proper manner, to the right persons, and in at least the correct amount (i.e. $3,070 to the Parker Plaintiffs and $3,070 to the Betzel Plaintiffs). [Finding of Fact Nos. 15, 16, 17, & 18]. First, the Leases do not specify the manner in which the shut-in payments should be **paid or received**. [Finding of Fact No. 9]. Thus, as discussed in *TSB Exco Inc.*, the Court will look to the Restatement (Second) of Contracts § 249 for

---

[20] Restatement (Second) of Contracts § 249 is entitled "When Payment Other Than By Legal Tender Is Sufficient." Black's Law Dictionary defines "legal tender" as "[t]he money (bills and coins) approved in a country for the payment of debts, the purchase of goods, and other exchanges for value." BLACK'S LAW DICTIONARY (7th ed. 1999).

31

guidance in determining whether MSB's method of paying the shut-in royalty satisfied its obligation under the Leases.   The Court notes that between April 2009 and March 2010, MSB paid the Plaintiffs production royalties from the sale of gas from the Well via checks sent standard mail with the USPS. [Finding of Fact No. 7].   These consistent actions established a "manner current in the ordinary course of business" between the parties—namely, that royalty payments were paid via checks mailed through the USPS.   Indeed, MSB tendered its shut-in royalty payments to the Plaintiffs, together with the Shut-in Letters notifying them of the reason for the shut-in, in the same manner—by mailing checks to the Plaintiffs via the USPS. [Findings of Fact Nos. 15 & 16].   MSB's payment is also consistent with the standard method of tendering obligations due under oil and gas leases generally. *TSB Exco Inc.*, 818 S.W.2d. at 420 (noting that "checks are used for payment of obligations in oil and gas leases . . . in the ordinary course of business").

Second, MSB tendered the shut-in royalty payments in a timely manner.   Pursuant to paragraph 12 of the Leases, the shut-in royalty payments were due to the Plaintiffs on August 6, 2009. [Findings of Fact Nos. 9 & 20].   On July 31, 2009, the USPS received the Shut-in Letters, with the corresponding shut-in royalty checks, from MSB for delivery to the Plaintiff via certified mail. [Finding of Fact No. 17].   On August 3, 2009, three days before the shut-in royalties were due, the USPS gave the Plaintiffs notice that their respective letters were being held for pick-up. [Finding of Fact No. 18].   Although the Betzel Plaintiffs retrieved the Betzel Shut-in Letter on August 4, 2009, before the royalties were due, the Parker Plaintiffs failed to pick up the Parker Shut-In Letter until August 26, 2009. [Finding of Fact Nos. 19 & 21].   The Parker Plaintiffs' late pick-up, however, does not mean that the payment was made on August 26, 2009; rather, it was timely made on August 3, 2009.

Finally, MSB paid the shut-in royalty to the correct persons and in the correct amount. Specifically, paragraph 12 of the Leases required MSB, as lessee under the Leases, to tender "at annual intervals the sum of Fifty Dollars ($50.00) per net mineral acre per proration unit per well" to the lessors. [Finding of Fact No. 9]. Thus, MSB owed the Betzels and the Parkers, as lessors, royalty payments calculated according to their 50% mineral interest in 121.8 and 120.8 acres of land, respectively (*i.e.* $3,045.00 to the Betzels and $3,020.00 to the Parkers). [Findings of Fact Nos. 10 & 11]. In tendering a check to both the Betzels and the Parkers for $3,070.00 each, MSB actually paid the Plaintiffs more than they were due according to the shut-in royalty clause. [Findings of Fact Nos. 9 & 16]. For all these reasons, the Court concludes that MSB successfully extended the Leases by timely and properly tendering payment of the shut-in royalties.[21]

---

[21] This Court concludes that the untimely payment cases cited by the Plaintiffs are inapplicable or distinguishable from the suit at bar.

The cases of *Rabie v. Sonitrol of Houston, Inc.*, 982 S.W.2d 194, 197 (Tex. App.—Houston [1st Dist.] Aug. 13, 1998, no pet.), and *Daniels v. Lavery*, No. 05-06-00216-CV, 2007 Tex. App. LEXIS 1382, at *13–14 (Tex. App.—Dallas Feb. 23, 2007, no pet.) are inapplicable because they involve the requirements of Tex. R. Civ. P. 21a "Methods of Service." Rule 21 establishes the requirements for filing and serving pleadings and motions, and Rule 21a sets out how service may be effectuated. Because a shut-in royalty payment is not a pleading or motion, this Court concludes that Rule 21a—and, therefore, these two cases—are inapplicable to the suit at bar.

Additionally, *Rabie* is distinguishable because the mail item was returned to the sender "unclaimed" and never ultimately reached the intended recipient. 982 S.W.2d at 197. Moreover, there is no indication in *Rabie* that the USPS left a notice for the intended recipient as in the present suit [Finding of Fact No. 18]; rather, the notations of USPS's attempted delivery were made "on the envelope" itself. *Id.*

In *Appling v. Morrison*, 227 S.W. 708 (Tex. App.—1921, no writ), the lease stated that shut-in royalty payments could be made to the lessor or a bank. *Id.* at 709. Although the disputed payment was mailed in time, it did not reach the bank before the deadline and the leases were held to have terminated. *Id.* In the suit at bar, however, payment was made to the lessors themselves rather than a bank. [Finding of Fact No. 16]. Additionally, the USPS received the Shut-in Letters and notified the lessors that the Shut-in Letters were being held for pick-up several days before the deadline. [Finding of Fact Nos. 17 & 18].

The lease at issue in *Corley v. Olympic Petroleum Corp.*, 403 S.W.2d 537 (Tex. Civ. App.—Texarkana May 17, 1966, writ ref'd) was held to have terminated for failure to timely tender a delay rental payment to the lessor's bank. *Id* at 540. In making its determination, the Court in Corley relied on the following paragraph from an oil and gas treatise:

> "Where there is no provision in the lease . . . providing payment by mailing, and the lease merely provides that payment of rentals may be made to the lessor or to his credit in a named bank, the rent is not paid until the remittance is received by the lessor or by the named bank with proper instructions to credit it to the account of the lessor. In such a situation it has been held that where the lessee mailed a rental check to the depository bank in time to be received by it in the due course of mail on or before the date of payment, but the remittance did not reach the bank until two days after the due date, mailing did not constitute payment and that the lease terminated because of nonpayment of rental."

*Id.* at 539 (citing 2 Summers, Law of Oil and Gas, Per. Ed. 434, § 344).

The Court first notes that this treatise is non-Texas specific. Even if this provision is applicable, however, this Court concludes that the Parker Shut-in Letter was timely "received by the lessor" when the USPS notified the Parkers and

**C. MSB is not estopped from asserting that the Leases did not terminate or that it timely and properly paid shut-in royalties to the Plaintiffs.**

The Plaintiffs contend that MSB is estopped from asserting that it properly paid the Plaintiffs' shut-in royalty payments such that the Leases did not terminate. The Plaintiffs' contention fails for lack of evidence. It is true that pleadings in other actions or proceedings which contain statements inconsistent with a party's present position are receivable as admissions. *Sanford v. Johns-Manville Sales Corp.*, 923 F.2d 1142, 1148 (5th Cir. 1991) (noting that statements within pleadings are generally admissible as party admissions, assuming they are relevant to the dispute); *Continental Ins. Co. v. Sherman*, 439 F.2d 1294, 1298 (5th Cir. 1971) ("[A]s a general rule the pleading of a party made in another action, as well as pleadings in the same action which have been superseded by amendment, withdrawn or dismissed, are admissible as admissions of the pleading party to the facts alleged therein, assuming of course that the usual tests of relevancy are met.") (*internal citations omitted*); *see also St. Paul Fire & Marine Ins. Co. v. Murphee*, 357 S.W.2d 744, 747 (Tex. 1962) (*citing* MCCORMICK AND RAY, TEXAS LAW OF EVIDENCE, 2nd ed. 1956, Vol. 2, § 1145, p. 34). In order for judicial estoppel to apply, however, three elements must be met: (1) a party has taken a position clearly inconsistent with a previous one; (2) the court has accepted the

---

Betzels on August 3, 2010, that the Shut-in Letters were being held for pick-up. [Finding of Fact No. 18]. Further, the facts in *Corley* are distinguishable from the suit at bar. In *Corley*, the post office notified the lessee that it lost the original envelope containing the lessor's delay rental payment. *Id.* at 538. The lessee then mailed another check to the lessor's bank—this time almost a month after the delay rental was due—and the bank did not deposit the check until a month and a half after the deadline. *Id.* at 538–39. Unlike the suit at bar, the *Corley* lessor did not have a payment that was timely tendered and awaiting customer pick-up before the deadline, nor did the lessor receive any such notification from the post office.

In *Keller v. Dunbar*, 37 F.2d 868 (5th Cir. 1930), the lessee attempted to pay a delay rental by telegraph when the lease at issue did not specify a means of payment. The *Keller* court held that the lessee chose the means of payment (a telegraph office, which then mailed the payment to the lessor's bank), and the Court held that the telegraph office was the lessee's agent and not the lessor's. *Id.* at 869. Thus, the lease terminated when the payment did not reach the bank until after the deadline due to the telegraph officer's delay. *Id.* In the present suit, however, the USPS accepted the Shut-In Letters and notified the Plaintiffs that the Shut-in Letters were being held before the August 6, 2009 deadline. [Finding of Fact No. 18]. Moreover, unlike the telegraph office in *Keller*, there is no indication that the lessee's chosen agent (USPS) was dilatory in delivering the Shut-in Letters to the Plaintiffs.

Finally, *Tucker v. Hugoton Energy Corp.*, 855 P.2d 929 (Kan. 1993) is distinguishable because the dispute involved a lessee who elected not to repair the well due to a limited market for gas. In the present suit, it was the pipeline's operator, rather than the lessee, who refused to transport the gas [Finding of Fact No. 12], and the dispute involves lack of an "available" pipeline rather than lack of a market [Findings of Fact Nos. 38 & 44].

previous position; and (3) the non-disclosure of the position was inadvertent. *Kane v. Nat'l Union Fire Ins. Co.*, 535 F.3d 380, 385–86 (5th Cir. 2008).

The Plaintiffs have failed to provide proof of inconsistent statements by MSB which would form the basis of their estoppel claim. The Plaintiffs' Motion for Summary Judgment only generally references the Disclosure Statement, claiming that MSB took a position therein that is inconsistent with its assertions in the suit at bar. [Finding of Fact No. 39]. The Plaintiffs' Response and Reply, however, specifically references the statement at issue in the Disclosure Statement. The Court has reviewed both the Disclosure Statement in its entirety and the specific statement referenced by the Plaintiffs' Response and Reply, and the Court concludes that MSB did not admit that the Leases terminated.

In section 5.6 of the Disclosure Statement, MSB set forth that Freedom Pipeline's wrongful activities regarding the Well "placed the Debtor *in default* of its oil and gas lease obligations and put the leases themselves *at risk of* termination." (Emphasis added). [Finding of Fact No. 25]. Although MSB stated it was *in default* of the Leases, MSB never admitted that the Leases actually terminated or even mentioned shut-in royalties. Rather, MSB admitted that Freedom Pipeline's actions placed the Leases *at risk of* termination, which MSB rectified by properly paying Plaintiffs' shut-in royalties to preserve the Leases. Thus, this Court concludes that the language asserted by MSB in the Disclosure Statement (*i.e.* that they were in default and at risk of termination under the Leases) is not inconsistent with their position in the Adversary Proceeding (*i.e.* that the Leases have not terminated because they timely and properly tendered shut-in royalty payments to the Plaintiffs). As such, the Plaintiffs' argument fails, and MSB is not estopped from asserting that the Leases did not terminate or that it properly paid the shut-in royalties to the Plaintiffs.

**D.  The Plaintiffs' trespass to try title suit and suit to quiet title fail.**

Oil, gas and mineral leases vest title to the oil and gas in place in the lessee. *Waggoner Estate v. Sigler Oil Co.*, 19 S.W.2d 27, 27 (Tex. 1929).  However, the lessee's estate is a determinable fee that may terminate due to conditions or special limitations in the lease. *Waggoner Estate*, 19 S.W.2d at 30–31; *Johnson v. Gurley*, 52 Tex. 222, 226 (Tex. 1879).  But so long as the lease is valid and title remains vested in the lessee, a lessor's trespass to try title and suit to quiet title must fail. *See Green v. Texas Gulf Sulphur Co.*, 393 F.2d 67, 68 (5th Cir. 1968); *Skelly Oil Co. v. Archer*, 356 S.W.2d 774 (Tex. 1961); *see also Fin. Freedom Senior Funding Corp. v. Horrocks*, 294 S.W.3d 749 (Tex. App.—Houston [14th Dist.] 2009, no pet.).

In the suit at bar, because MSB properly and timely tendered the shut-in royalty payments to the Plaintiffs, this Court concludes that the Leases remain in full force and effect and that the title to the oil and gas in place remains vested in MSB.  Therefore, the Plaintiffs' trespass to try title suit and suit to quiet title necessarily fail.

**E.  The Plaintiffs are not entitled to recover their attorneys' fees pursuant to chapters 37 or 38 of the Texas Civil Practice and Remedies Code.**

Because the Court has concluded that the Plaintiffs' Motion for Summary Judgment must be denied in its entirety, the Court further concludes that the Plaintiffs are not entitled to recover their attorneys' fees under chapter 37 of the TEX. CIV. PRAC. & REM. CODE.  *City of Houston v. Harris County Outdoor Advertising Ass'n*, 732 S.W.2d 42, 56 (Tex. App.—Houston [14th Dist.] May 7, 1987, writ ref'd n.r.e.) (holding that attorneys' fees are not recoverable for a non-prevailing party in a declaratory judgment action).

The Court also concludes that the Plaintiffs are not entitled to recover attorneys' fees under chapter 38 of the TEX. CIV. PRAC. & REM. CODE because although the Plaintiffs request attorneys' fees under chapter 38 in their Motion for Summary Judgment, they failed to *plead* for such relief in

their Complaint as is required pursuant to chapter 38. Further, the Plaintiffs did not prevail in their action against MSB. *See In re Fleetwood Homes of Tex., L.P.*, 257 S.W.3d 692, 695 (Tex. 2008) (absent an agreement, the recovery of attorney's fees pursuant to chapter 38 is only available to prevailing parties).

**F. MSB may recover its reasonable and necessary attorneys' fees from the Plaintiffs.**

At the hearing on August 10, 2010, counsel for MSB represented to the Court that if the Court denies the Plaintiffs' Motion for Summary Judgment and holds that the Leases have not been terminated, then the counterclaims asserted by MSB become moot, and all relief requested in MSB's Motion for Summary Judgment is withdrawn except for the request for attorneys' fees. Because the Court has held that the Leases are in effect, MSB's counterclaims have become moot; therefore, MSB's Motion for Summary Judge has also become moot—aside from its request for attorneys' fees.

Because the Plaintiffs invoked a claim for a declaratory judgment and attorneys' fees pursuant to chapter 37 of the Texas Civil Practice and Remedies Code, either party may plead for and recover its attorney's fees. *Knighton v. IBM Corp.*, 856 S.W.2d 206, 210 (Tex. App.—Houston [1st Dist.] 1993, writ denied). The Texas Uniform Declaratory Judgments Act provides that "the court *may* award costs and reasonable and necessary attorney's fees as are equitable and just." TEX. CIV. PRAC. & REM. CODE ANN. § 37.009 (Vernon 2008) (emphasis added). In its Complaint, MSB requested that it be awarded attorneys' fees pursuant to section 37.009. Accordingly, because MSB has pleaded for attorneys' fees and has also prevailed in this dispute, the Court concludes that it is equitable and just that MSB recover its reasonable and necessary attorneys' fees from the Plaintiffs.

## V. CONCLUSION

In sum, the Leases have not terminated, but rather remain in effect. There is no genuine issue of material fact to decide, and therefore no trial is necessary.   A judgment consistent with the Memorandum Opinion will be entered on the docket simultaneously with the entry on the docket of this opinion.

Signed this 14th day of September, 2010.

Jeff Bohm
United States Bankruptcy Judge